Whaley, Judge,
delivered the opinion of the Court:
This is a patent case which comes before this court through a special jurisdictional act approved April 18, 1924, which act is as follows:
“ Be it enacted by the Senate and Mouse of Representatives of the United States of America in Congress assembled, That the United States Court of Claims be, and it is hereby, authorized and directed to hear and determine the claim of Elwood Grissinger for compensation for any unlawful sale by the United States, and any unlawful sale by others for the United States, either in the United States or elsewhere, for any use outside the United States and exclusive *138 of any use by the United States, of certain long-distance telephone repeaters and of a system for the use of any repeaters on transmission lines, as disclosed and described in certain letters patent granted to said Grissinger by the United States, and also as disclosed and described in patents granted to him by certain foreign countries and competent jurisdiction is hereby conferred upon said court in this matter:
“ Provided, That in any such suit the United States may avail itself of any and all defenses, general or special, that might be pleaded by defendant in an action for infringement under the law in any jurisdiction where such sale occurred, or otherwise, at the date, of such sale.”
In telephonic circuits in which the stations are separated at a considerable distance from each other, the electrical currents traversing these circuits for the purpose of carrying speech become both attenuated and distorted. The overcoming of these phenomena, inherently present in a telephonic circuit, early presented a problem to telephone engineers and experts. One way of solving this problem was to supply additional electrical energy to the telephonic circuit at some point or points intermediate the stations in such manner as to overcome both attenuation and distortion, and thus render it possible to transmit a telephone conversation over long distances. The device for controlling the supply of additional energy was called a repeater, and the electrical circuit, by virtue of which it functioned, was termed a repeating circuit or system.
The plaintiff, Elwood Grissinger, a citizen of the United States, was early engaged in experimental telephonic research on repeaters and repeater systems, beginning his study of them in 1899 and continuing through 1914 and 1915. As a result of his investigations and experiments, he made application for a United States letters patent on telephone repeaters on February 20, 1902. This United States application, together with ten other applications of plaintiff, was purchased by the American Telephone and Telegraph Company on June 3, 1916, the purchase price being $500,000. The aforesaid application subsequently matured into a patent which was granted to the American Telephone and Telegraph Company as assignee of the plaintiff on September 12, 1916.
*139 The United States patent to Grissinger, just referred to, is not directly involved in the present cause before this court, and we mention these facts as merely indicative of the plaintiff’s position in telephonic research and that plaintiff in his experimental and research work created something of evident practical value.
In March and April of 1912, Grissinger made application for letters patent on his repeater in France, Italy, Great Britain, and Belgium. The disclosures of these foreign patents are more or less similar in their main aspects to that of the Grissinger United States letters patent, previously referred to, as issued to the American Telephone and Telegraph Company, Grissinger’s assignee. Patents on. these various foreign applications were, duly issued to' Gris-singer, who owned and held the entire interest therein.
Subsequent to the entry of the United States into the World War, the American Expeditionary Forces found that the telephone service available in France was antiquated^ and inadequate, and a complete telephone system was designed, maintained, and operated by the said forces entirely j for their own official requirements. This telephone system had its own separate telephone exchanges, even in towns in which there were exchanges of the French telephone systems. While the telephone systems of the American Expeditionary Forces and of the French Avere separate and were not operated together as a consolidated unit, such systems were sometimes interconnected to give communication to a part of France which was served by the French telephone lines.
In conjunction with the American Expeditionary Forces’ telephone systems, a cable was laid across the English Channel, and leased lines in England were acquired permitting communication with London and other points of England from points in France. In May or June 1919 the American Expeditionary Forces’ telephone system was extended into Belgium, and communication was also established with Holland and Germany after the armistice.
In connection with the American Expeditionary Forces’ telephone system, nineteen repeater stations were installed in various parts of France. These repeater stations had *140 circuits which were technically known as the “ 22 type.” The repeater circuits used by the American Expeditionary Forces in France were adopted with the advice and collaboration of the American Telephone and Telegraph Company, from which the personnel of the Signal Corps, insofar as it related to telephony, was almost wholly recruited.
Several months subsequent to the armistice, a repeater was removed from France and turned over to the Italian Government and installed at Turin, Italy. This, repeater was for use on the Paris-Rome circuit, which was owned jointly by the Italian and French Governments. There is no satisfactory evidence that this repeater was installed to make communication possible with Italy over the American Expeditionary Forces’ telephone system. Other than this, the record does not disclose the construction or use of a repeater installation outside of France.
In or about August 1919 the United States sold to France the telephone lines and all equipment which constituted the American Expeditionary Forces’ telephone system in France with the exception of the lines and equipment already leased from France, and at the time of such sale of the telephone system including these repeater-installations, Grissinger’s French, Italian, Belgian, and British patents were all in full force and effect.
The congressional act which brings this case before us is directed to a determination of infringement of plaintiff’s patent rights by the act of sale for or by the United States. Any use by the United States is expressly excluded from -consideration by this act.
As has been stated, supra, the United States patent to Grissinger, no. 1198212, was issued or granted to the American Telephone and Telegraph Company, plaintiff’s assignee, and the same is therefore not before us for consideration, plaintiff having no right, title, or interest therein. This leaves for our consideration the previously mentioned foreign patents of the plaintiff.
The only act of sale presented by the record is the sale to France by the United States in August 1919 of the American Expeditionary Forces’ telephone lines and repeater installations in France.
*141 It is a fundamental concept that the patent laws of any individual country and the monopolies granted thereunder can only be coextensive with the boundaries of that country.-^
The act of sale to France of telephone system installed by the United States in France could therefore not in any form or manner infringe the Belgian, British, or Italian patents of plaintiff.
We shall first consider the alleged infringement of the Grissinger French patent by the act of sale to France, such consideration necessarily including the dual question of identity of construction and functioning of the repeater installations incorporated in the American Expeditionary Forces’ telephone system as compared with the French patent, and its validity.
In order to present an intelligent discussion of this matter it is necessary to revert to some of the basic principles involved in telephonic transmission.
The elemental parts of a telephone transmission system comprise a transmitter and a receiver connected by an electrical circuit termed a transmission line which is connected to a source of electrical energy. Articulate speech is a very complex motion of the air particles and is composed of oscillations made up of several composite frequencies. When a word is spoken into the telephone transmitter it causes a diaphragm or moving element therein to partake of the exact vibrations of the adjacent air particles. The diaphragm operates a microphone which functions to cause variations in the electrical current flowing in the transmission line, identical in frequency and intensity with the vibrations of the air particles before the transmitter. These current oscillations cause similar variations in the magnetic pull of an electro-magnet mounted in the receiver adjacent a soft iron diaphragm. These magnetic vibrations cause a corresponding movement of the diaphragm with the result that the electrical energy is retranslated into a motion of the air particles which are in turn impressed upon the ear of the listener. In practice it is, of course, necessary to have both transmitting and receiving instruments at each end of the transmission line so that conversation may be had in either direction. The intelligibility of speech transmission in *142 volves two characteristics, one being loudness or strength of signal, and the other being clarity or freedom from distortion.
Every telephonic transmission line has four electrical effects inherently present: These are resistance, leakance, inductance, and capacitance. These various electrical properties have been explained and defined in the findings and we will not reiterate them here further than to state that on a long line these properties act to decrease the loudness of the transmitted speech, and also to distort the speech waves so that when a telephonic transmission line exceeds a certain length dependent, of course, upon its construction, size of wires used, et cetera, the speech transmitted becomes unintelligible by the dual effects of at'tentuation and distortion. A telephone repeater system must obviously be of such a nature as to not only supply additional energy to the telephone transmission line at some point intermediate to the two stations but it must function to modulate this energy with substantially the same oscillatory characteristics of the current flow impressed upon the telephone transmission line by the transmitter, and it must also perform this function irrespective of which end of the line is, at' that time, the transmitting end. The first telephone repeater systems accomplished this complex functioning by taking from the electrical midpoint of the transmission line a portion of the oscillatory electrical energy flowing into the same, utilizing the energy thus taken off in a telephonic relay or repeater unit to modulate electrical energy obtained from a source located at the repeater station which additional modulated energy was then fed back into the line at its electrical center in phase relationship or in such manner as to be superimposed on the original current waves present in the transmission line.
This type of repeating system, technically known as the “ 21 type ”, contributed to the lengthening of distances over which telephonic conversation might be had. As the repeater had to be located, however, at the electrical center of the transmission line, it was only possible to use a single repeater. *143 In contradistinction to this system, the Grissinger invention in issue is directed to what is known as a repeater system of the “ 22 type ”, which is a type of repeater system in which several repeaters may be utilized in tandem operation on a telephone transmission line, and it is repeater systems of this latter type which enabled telephone conversation to be successfully carried on over long distances. By tandem operation we mean that the line is divided into a series of sections and at the end of each section a repeating system is installed which feeds amplifying energy into the next section, at which end it is again amplified by a second repeater system, et cetera. It is a repeater system of this “ 22 type ” which is involved in the present issue before us.
Before taking up in detail for discussion the “ 22 type ” of repeater as exemplified by the French Grissinger patent, we desire to call attention to an aspect of telephone transmission lines which is, in our opinion, a predominant factor in the discussion of infringement and validity to follow.
We have already referred to resistance, inductance, and capacitance as three of the electrical characteristics present in every telephone transmission line. The resistance, inductance, and capacitance of any individual portion of a telephone transmission line are entirely dependent upon the type of construction employed in that portion of the line. The size of wire used controls the resistance and the values of inductance and capacitance, for a given length of open wire line differs materially from the values for the same length of cable line. The combined effect of inductance and capacitance in an electrical circuit is termed electrical reactance, and the term “ electrical impedance ” comprehends the total effect of an electrical circuit of resistance and reactance with current variation of a certain definite frequency. That is to say, the impedance of a telephone transmission line is not only changed in value by a change in resistance, inductance, or capacitance of the line, but it also changes or varies with different frequencies of current variation therein. As the electrical variations impressed upon the telephone transmission line by articulate speech comprise a composite of various simultaneous frequencies, it will *144 therefore be seen that the impedance effect in a telephonic circuit is one of extreme complexity.
In addition to this the average long-distance line, particularly those constructed prior to April 18, 1912, “the controlling date of the French patent, does not have uniform electrical characteristics throughout its entire length. An actual line usually possesses irregularity such as irregular leakages due to poor or wet insulators and foliage in contact with the wires where the line traverses wooded country, and short sections of cable are usually inserted into the line at such points as river crossings and railroad crossings or where the line traverses towns or cities.
For these reasons if a telephone line two hundred miles in length be contemplated as divided into ten units of twenty-mile sections, it will be highly improbable that each section will have one-tenth of the resistance, inductance, and capacitance values of the line considered as a whole, or that the line will be electrically uniform in character. As illustrated in connection with finding XII, the insertion of one and one-quarter miles of underground cable in a telephone line of one hundred sixty-five miles in length of no. 8 gage wire, has a material effect upon the resistance and reactance of the line at various frequencies.
The French patent to Grissinger, no. 452359 was applied for in France, April 18, 1912, approximately ten years subsequent to the United States Grissinger application. Due to this lapse of time the International Convention which gives to inventors the benefit of an earlier filing date of an application in another country, does not apply, and the effective date of the Grissinger invention in France is that of his filing date, April 18, 1912. This French patent is quite voluminous in character, the drawings alone containing some sixty-three figures and illustrations. The patent for the most part is directed to the constructional details of a repeater unit or telephonic relay of the mechanical type which unit may be summarized or defined as an apparatus adapted to be associated with an input circuit and an output circuit and a source of energy supply in such a manner that relatively weak telephonic currents received in the input circuit are reproduced in the output circuit in an *145 amplified form. The patent is also directed to repeating circuits or systems of both the 21 type and the 22 type.
The circuit which is in issue here is that shown in figure 31 of the patent and is of the 22 type. This is shown in the appended figures on page 118 of our findings, the top diagram illustrating the circuit as shown in the French patent, the bottom diagram being a simplified drawing of the same circuit. As indicated in the simplified diagram, the telephone transmission line is divided into an east-line section and a west-line section at the point where the repeater station is located. Each of these line-sections is connected at the repeater station to a balancing extension network through repeater coils each of which comprises primary windings and a secondary winding located on the same core, the primary windings being in two sections with a tap or connection in the electrical center thereof.
The simplified diagram shows the west-line section talking and the east-line section listening. When thus functioning, the telephonic currents received from the west-line section pass through both the primary windings of the west repeater coil in the same direction, inducing similar current variations in the secondary of this repeater coil, which currents pass through the input circuit of the westward repeater unit. This repeater unit feeds an amplified output through an inductive connection into the eastward-line section at the electrical midpoint or connection of the eastern real line section with its balancing network. This midpoint is obtained through the center tap of the eastern repeating coil. If the eastern network is properly designed to balance the eastern real line, the currents through the two primaries of the eastern repeating coil will balance each other and produce no resultant effect in the secondary of the eastern repeating coil, and this then produces no feed back through the westward repeater unit to which it is connected.
When conversation takes place in the opposite direction, the functioning of these devices will be reversed, the voice currents in the eastern-line section feeding through the eastern repeating coil to the westward repeater unit, from which the amplified output is supplied to the electrical *146 midpoint between the westward real line section and its balancing network.
The plaintiff claims as his inventive conception two main features: (a) Inductive coupling of the repeater instruments to the transmission lines, and (£>)' balancing networks conductively connected to the line sections with such networks possessing the same electrical characteristics as their complementary real-line sections.
The inductive coupling feature of the repeater instruments is clearly and unqualifiedly present in the disclosure of the French patent in suit.
The second feature deals with what is perhaps the main issue of this case and presents a somewhat difficult question for determination. The purpose of the balancing networks in their association with the real-line sections is to provide for a balancing effect in the two primary windings of the repeating coil which forms a connection between the real-line section and the balancing network. If a good electrical balance is not present in these two windings, distortion will take place, and if sufficiently unbalanced, the repeater will sing or howl. On the contrary, a maximum balance between the real-line section and this balancing network will enable a high degree of amplification to exist without distortion.
Figure 31 of the Grissinger French patent discloses, as stated in the text of the French patent, “ a condenser 80 and preferably an inductive resistance 90”, these elements being connected in series. As they are presumably adjustable in value they can be adjusted to have the same capacitance, resistance, and inductance values possessed by the real-line section with which they are associated, but from the testimony and the tests made in this case this would not be sufficient to give a maximum balancing effect with the ordinary or average telephone line, which, as has previously been stated, is more or less nonuniform in character and distribution of inductance, capacitance, and resistance. The language of the patent with respect to the use of the condenser 80 and inductive resistance 90 is as follows: “ The purpose of this arrangement is to permit the introduction of resistance and capacity in order to make the electrical chair- *147 acteristies of the two lines on different sides of the repeating coil the same.” By the “ two lines ” the patentee means the real line and its associated balancing network or artificial line.
Plaintiff urges that this phraseology is sufficient to instruct the man skilled in the telephone art as of the date of application of the French patent (April 18, 1912), to use for a balancing network a device which is termed an artificial line of the replica type.
An artificial line of the replica type is composed of a series of sections, each section having the same electrical characteristics as the corresponding section of the actual line with the sections arranged in the same order. In other words, the actual line is contemplated as being divided into a number of short sections, say, of twenty miles each. The artificial line is then constructed in a series of sections, each section being the electrical replica of a corresponding twenty-mile section of the actual line. These sections are then assembled together in the proper sequence to simulate the entire real line. An artificial section of the replica type can be compactly constructed, so that each section corresponding to a twenty-mile length of the real line occupies only a few cubic inches of space. By such a method of construction an artificial line can therefore be made having the same characteristics of electrical properties as the real line, and in addition having these froferties or characteristics distributed with the same nonu/niformity as exists in their distribution in the read line.
Does the language of the patent which we have just quoted instruct those skilled in the art to use as a balancing network an artificial line of the, replica type? If it does not, it may be presumed that the circuit disclosed in the French patent to Grissinger is inoperative to obtain balance under all conditions and the patent, therefore invalid through lack of proper disclosure, as an artificial line of the replica type is essential to proper phase balancing where telephone lines are nonuniform in character. In this aspect the French patent law regarding a sufficient disclosure is in accord with our patent laws. We quote in this connection *148 from the extracts of Pouillet, the French patent authority, section 2, Nullities, art. 370, Grounds for Nullity:
“ Patents granted under the following conditions shall be null and without effect * * * if the patents relate to theoretical principles, methods, systems, discoveries, and conceptions the industrial application of which are not indicated.” (Italics ours.)
Figure 31 of the French patent unequivocally discloses what is known as a lumped resistance, inductance, and capacity, and while the same could be adjusted so that the balancing network would have its resistance, inductance, and capacity each equal in value to these properties as existing in the main line, no adjustment could be made with the form of apparatus shown which would in any way simulate their distribution in the real line.
If we give, however, the meaning to the word “ characteristics ” used in the patentee’s description of the condenser 8b and the inductor of resistance 9s, the meaning of this word given in Webster’s Dictionary, i.e., “ distinctive qualities or traits ”, it may on a certain basis be assumed that the man skilled in the art will use a balancing network of the replica type in lieu of the inductive resistance and condenser shown in the drawings of figure 31 of this patent. This assumption can, however, only be made on the distinct basis that the man skilled in the art would have sufficient prior knowledge to realize that the inductive resistance 9s and capacity 8b disclosed and described in the Grissinger patent are insufficient for proper balance and that he was familiar with artificial lines of the replica type. We find such a basis in the fact that artificial lines of the replica type were already known in the prior art as exemplified by the publication entitled “ Submarine Telegraphs ” by Charles Bright, published in London in 1898, extracts of which have been filed as defendant’s exhibit 32 (see finding XXXVII), and the United States patent to Jacques, No. 781207, issued January 31, 1905, defendant’s exhibit 17. In the Jacques patent, which is directed to a 22-type telephone repeating system, it is specified, in lines 1 to 5, inclusive, page 4, as follows:
*149 “In practice we may do better than this and substitute for the half of each circuit beyond the relay an inexpensive artificial circuit having the same electrical properties as the actual line * *
It is further stated in this prior patent with reference to the balancing networks disclosed, that—
“Al1 and Al2 are artificial lines having approximately the same distributed telephonic resistance, capacity, inductance, and shuntage as the actual lines with which they are directly connected.” (Italics ours.)
In order to hold the patent operative as a disclosure, we will grant this extremely liberal interpretation and assume that the man skilled in the art has sufficient prior knowledge to replace the condenser 8s and the inductive resistance 9s with an artificial line of the replica type in order to obtain a proper balance.
The repeater system installed in the American Expeditionary Forces’ telephone systems in France is shown in simplified form in defendant’s exhibit 3, illustrated on page 126 of our findings, it having been stipulated in the record that this exhibit is diagrammatically a correct illustration of the telephone system as installed. The circuit arrangement of this repeater installation is substantially similar to the Grissinger circuit shown in figure 31 of the Grissinger French patent. A comparison shows that both of them include terminal telephone instruments; both of them have two telephone line sections; both of them show a repeating station located somewhere along the speech wave channel, in which repeating station there are repeating coils used for inductive coupling of the input and the output elements of the speech wave amplifiers through their respective sections of line and their respective balancing networks, and both of them have twin speech-wave amplifiers or repeater units cross connected.
It is true that the American Expeditionary Forces’ repeating installation used audion tubes for the repeating units or amplifiers instead of the mechanical microphonic amplifiers described in the Grissinger patent, but the repeating circuit shown in figure 31 of the Grissinger French patent, although described in connection with a microphonic repeater, is of *150 general application and is not limited to use with any specific type of amplifier or repeater unit.
It is also true that the repeating coil connections to the repeater instruments were reversed in the American Expeditionary Forces’ system, as compared to the Grissinger circuit, in that the connections of the input and the output circuits to the repeaters were reversed. Filters were also used.
It is argued by defendant that these changes depart from the spirit and teachings of the Grissinger circuit. To this we cannot agree. The substitution for the micro-phonic amplifier of Grissinger of the audion amplifier, a later, much better, and more reliable type of amplifier, would be entirely obvious to the man skilled in the art, and such substitution would involve no departure from the general principles and teachings of the Grissinger repeating circuit. The same is equally true in respect to the reversal of the input and output circuits. That such reversal could be readily accomplished is evident from the testimony of plaintiff’s expert witness, Dr. Smith.
The use of filters which function merely to limit the frequency band within certain prescribed frequencies also does not affect or alter the functional operation of the system, as the filters act merely to prevent extraneous frequencies from entering the repeating system.
Practically all of the long-distance circuits of the American Expeditionary Forces’ system were both phantomed and composited. This rendered it necessary to insert certain repeating coils in the line in order to obtain the phantom circuits, and when this was done it was necessary to install a repeating coil in the balancing network as well. It was also necessary to add a composite balancing set which was more or less the electrical equivalent of the composite set in the line circuit. The balancing networks were more complex than a simple basic network and therefore in our opinion approximated balancing networks of the replica type.
Defendant’s witness, Wilfred M. Marsters, who was directly associated with the installation of the repeaters in France, indicates that with the repeating coils thus inserted in the balancing network or artificial line, the same *151 was inductively connected to the balancing bridge, instead of conductively connected thereto.
To this extent practically all of the long-distance construction actually used in France deviated from that disclosed in the stipulated drawing, defendant’s exhibit 3, which shows the balancing networks conductively connected to the remainder of the repeating circuit, and we must accordingly contemplate this diagram with this distinction.
In the opinion of this court in American Food Products Company v. The United States (73 C.Cls. 526), on defendant’s motion to strike facts stipulated from the agreed statement of facts, it was stated as follows-:
“ It is always the policy of the courts to encourage litigants to enter into a stipulation of the facts of a case and thereby save time, trouble, or expense; but at the same time it is equally important that the true facts of each case should be known, because only in this way can real justice be granted. A material fact stipulated which is not correct and true may result in causing the case to be decided in the wrong way. If either party were to be held strictly to the stipulation, when the testimony of witnesses showed that certain of the stipulated facts were not true, or that grave doubt was thrown on those facts, it would be extremely difficult to get litigants to enter into a stipulation.”
With this exception of the inductive coupling of the balancing networks which we will reserve for later discussion in connection with a consideration of the prior art, we hold that the American Expeditionary Forces’ repeater system comes within the terms of whatever monopoly has been created by the issuance of the French patent.
In order to ascertain whether a monopoly in fact has been created by the issuance of the French patent to Grissinger, it becomes necessary to consider prior knowledge and art as exemplified in the present instance by certain United States patents and publications.
The French law regarding the invalidation of a patent because of lack of novelty, is identical with our laws on this subject.
Pouillet, the leading French authority on patent law, summarizes this principle as follows in section 372 of his work (defendant’s exhibit 89) :
*152 “ When then an anteriority is invoked the judge has not to ask, where it came from, from what person it emanates, how far back it dates, whether it has been practiced a little or much or whether, on the contrary, it has been entirely forgotten; it is useless to consider all that; what the judge must ask is simply this: Is the anteriority such that the invention can be executed? No other point need be examined; and, according to whether this question is answered in the negative or the affirmative, the invention is either new or not new.”
He also states in section 376 of his treatise as follows:
“Anteriority is or is not present, that is, lack of novelty, according to whether the definition applies to both objects or only to one of them. This identity must not, however, go as far as actual confusion; insignificant details, slightly different proportions, allow the identity to remain.”
Pouillet also shows in sections 406 and 408 that a prior patent, foreign or domestic, may constitute such an anticipation.
The United States patents chiefly relied upon by defendant, as anticipatory of the Grissinger French patent, are as follows:
United States patent to Eichards, no. 542657, patented July 16, 1895; defendant’s exhibit 15.
United States patent to Holman, no. 586382, patented March 26, 1895; defendant’s exhibit 13.
United States patent to Jacques, no. 781207, patented January 31, 1905; defendant’s exhibit 17.
United States patent to D’Humy, no. 847777, patented March 19, 1907; defendant’s exhibit 18.
United States patent to Stragiotti, no. 954402, patented April 5, 1910; defendant’s exhibit 14.
All of these patents disclose telephonic repeater systems of the 22 type, each of them disclosing a telephone system including terminal telephone instruments having two telephone line sections, with a repeating station located somewhere along the line at which repeating station, twin speech wave amplifiers or repeating units are cross-connected to the two line sections. All of these patents furthermore disclose the idea of the utilization of two *153 balancing networks each associated witb one of tbe real line sections.
During tbe taking of the testimony in this case by deposition, tbe question of the operativeness of tbe disclosure of certain of these patents was raised, on cross-examination of plaintiff’s experts. As a result defendant made certain alleged tests and demonstrations of certain of these patents at the Bureau of Standards on December 21, 1928, which tests were attended by plaintiff’s counsel and experts. These tests were not conclusive in proving the operativeness or inoperativeness of the circuits tested due to reasons specifically stated in finding XXXVIII, and at the suggestion of the commissioner of this court, to whom this case was subsequently referred, these tests were repeated by defendant’s experts at the United States Court of Claims on March 10, 1930.
No tests were made of the circuit disclosed by the patent to Jacques, no. 181201. As to this patent, therefore, we must proceed on the assumption that it is presumed to be operative, as it has been well established in patent procedure that the issuance of a United States patent is prima facie evidence of its operativeness and that if the question of operativeness of prior art patents becomes relevant, the burden in proving inoperativeness is on the plaintiff. What we have stated here, however, obviously does not apply to those patents which were tested and demonstrated by defendant’s experts before the commissioner. With respect to these patents we must accept the actual scientific facts presented by the tests themselves as to operativeness or inoperativeness, irrespective of whether the tests were conducted by defendant’s experts or plaintiff’s experts. A study of the record convinces us that ample time and opportunity were given to defendant to make all tests it desired, and an opportunity was also offered to plaintiff to make cross tests.
The patent to D’Humy, no. 841177, which was one of the patents the circuits of which were tested at the Court of Claims in 1930, discloses substantially the same circuit as that disclosed in the Grissinger French patent.

*154

*155 For comparative purposes we reproduce figure 3 of the D’Humy patent on page 154.
C and C' are the real line sections; L and U the cross-connected amplifier units; T6 and T7 the balancing or repeater transformers having their primary endings tapped at center points ¿10 and i11, respectively, and A and A' the balancing networks.
From a comparison of figure 3 of the D’Humy patent with figure 31 of the Grissinger French patent (see page 118) it will be evident that both the French patent to Gris-singer and D’Humy disclose two real-line sections each having associated with it a balancing network. Each patent also discloses twin amplifying units or repeating units having both their input and output sides inductively coupled to the two real-line sections. The balancing network in both instances is made up of a lumped resistance, inductance, and capacity. The D’Humy network is stated on page 2 of the patent, line 15, as having the following values:
“ * * * artificial lines A and A' each having resistance, inductance, and capacitance equal to its respective line circuit C and C'.”
Plaintiff urges that this balancing network is inoperative, as disclosed, and differs from the disclosure of the Grissinger patent in that the latter instructs the man skilled in the art to use a balancing network of the replica type with the resistance, inductance, and capacity distributed in a manner to simulate the real line with which it is associated.
This alleged difference, however, is more of a difference of interpretation than disclosure, for it will be recalled that the Grissinger French patent actually shows in figure 31 a balancing network comprising inductive resistance (which provides both inductance and resistance) and capacity. In other words, both the French patent to Gris-singer and the United States patent to D’Humy disclose in their diagrammatical circuits, lumped inductance, capacitance, and resistance operating for the same identical purpose, to wit, the balancing of the real line.
We are assisted in reaching a conclusion as to this identity between the disclosure of the Grissinger French patent and *156 the United States patent to D’Humy by the fact that the Patent Office records of the Grissinger United States application (defendant’s exhibit 2) show that on January 10, 1912, Grissinger requested an interference with the D’Humy patent which due to Grissinger’s early filing date was subsequently terminated favorably to Grissinger. Both Gris-singer and the United States Patent Office therefore recognized the identity existent between the 22 type, repeater circuits of Grissinger and D’Humy at that time, and the 22 type repeater circuit disclosed in figure 31 of the French patent to Grissinger is identical with that disclosed in figure 6 of his United States patent.
While the filing date of the Grissinger United States application was prior to D’Humy, the effective date of the Grissinger French patent is subsequent thereto.
When the D’Humy patent was tested before the Commissioner with its circuit arrangement, as disclosed, the same was found to be inoperative in that there was a lower degree of intelligibility of speech than the telephone line tested without the repeaters and repeating circuits.
It was stipulated, however, if the D’Humy circuit had been tested with the networks grounded and lines grounded and with an artificial line or balancing network of the replica type instead of the simple resistance, inductance, and capacitance disclosed by D’Humy, that the circuit would have been operative within the meaning and intent of the patent statutes. In other words, the inoperativeness of the D’Humy patent is cured when artificial lines of the replica type are used in lieu of the lumped resistance, inductance, and capacitance disclosed by D’Humy which is the identical proposition urged by plaintiff in connection with the disclosure of his French patent and which interpretation we have assumed, i.e., that the man skilled in the art would have sufficient prior knowledge as exemplified by the patent to Jacques to replace the inductive resistance 9.3 and capacitance 8a of the Grissinger disclosure with an artificial line of the replica type. But if the man skilled in the art possesses sufficient knowledge to make this change in the Grissinger disclosure and substitute for the lumped inductance, resistance, and capacitance shown by Grissinger an *157 artificial line of the replica type in order to have a proper balance at all times in the Grissinger circuit, he could with equal facility make the same change in the D’Humy circuit.
Plaintiff is, therefore, in a dilemma: If we give to his French patent the broad and liberal interpretation, which we have, it is anticipated by the D’Humy patent in view of the prior knowledge of those skilled in the art as exemplified by the Jacques patent. If, on the other hand, we should attempt to limit his French patent to- the exact disclosure of the drawing, involving simply an undistributed inductance, resistance, and capacitance, the circuit will then not operate to satisfactorily balance the average telephone line with its nonuniform characteristics, and certainly would not be infringed by the American Expeditionary Forces’ type of construction, in which the networks are more complex in character and approximate the replica type of artificial line.
A further point to which we direct attention, with reference to the D’Humy patent, is that D’Humy connects his balancing networks or artificial lines with the real lines through an inductive coupling and therefore the American Expeditionary Forces’ repeater construction approximates the D’Humy patent more closely in this aspect than it does the Grissinger French patent, with its conductive coupling of the balancing networks.
Plaintiff argues that this inductive coupling of the balancing networks to the l’est of the repeater circuits in the D’Humy patent is based on an erroneous theory that such coupling prevents a loss of electrical energy in the artificial lines. From an anticipatory point of view, however, a prior art patent must be viewed in the light of its actual disclosure. From this point of view, we are interested in the circuits and structures shown and described, and not in any particular theory of operation, provided that those skilled in the art can make the disclosure operate, and on this latter point we are convinced that this can be done.
For the reasons stated, we accordingly hold the Grissinger French patent to be invalid because of lack of patentable novelty when interpreted with sufficient breadth and scope *158 to include the American Expeditionary Forces’ repeater installations within the scope of its disclosure.
What we have stated with respect to the Grissinger French patent in suit would apply with equal facility to< the Grissinger Italian, Belgian, and British patents, as the 22-type circuit disclosed in all of these patents is identical in character with that disclosed in figure 31 of the Grissinger French patent.
We are not of the opinion, however, that the jurisdictional act under which this case comes before us contemplates more than a sale by the United States for the purpose of enabling others to make use of the repeaters. The only sale shown was that of the United States to France. There is no evidence that the single repeater taken to Turin, Italy, for use on the Paris-Home telephone line, owned jointly by the French and Italian Governments, was sold or that the United States received any compensation therefor. Action for compensation for the use of this repeater should have been directed against the French and Italian Governments.
The remaining repeaters were all located in France and while ramifications of the American Expeditionary Forces’ telephone system extended into England and Belgium, there is no evidence that the lines and equipment extending beyond the borders of France were other than conventional in character. The functioning of the repeater installations occurred in France and it is not evident to us how the use or functioning of a device in France could under any circumstances be said to infringe British or Belgian patents.
For the reasons stated, supra, we are of the opinion that plaintiff is not entitled to recover, on the grounds that his French patent is invalid and the Italian, Belgian, and British patents have not been infringed, and the petition should be dismissed.
It is so ordered.
Williams, Judge; Littleton, Judge; and Green, Judge, concur.
Booth, Chief Justiee, took no part in the decision of this case on account of illness.